**Wayne F. LINHART,**
**Plaintiff-Appellant,**
**Cross-Appellee,**

v.

**Edward GLATFELTER, Individually and as Village Manager of the Village of Clarendon Hills, and the Village of Clarendon, Hills, a Municipal Corporation, Defendants-Appellees, Cross-Appellants.**

**Nos. 84–1637, 84–2817.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1985.
Decided Aug. 22, 1985.

Patrick J. Williams, Connolly & Ekl, Hinsdale, Ill., for plaintiff-appellant, cross-appellee.

Heidi H. Katz, Fawell, James & Brooks, Naperville, Ill., for defendants-appellees, cross-appellants.

Before CUDAHY and COFFEY, Circuit Judges, and PELL, Senior Circuit Judge.

CUDAHY, Circuit Judge.

The Village of Clarendon Hills reprimanded acting police chief Wayne Linhart for conducting political activity in his office, and Linhart responded with a § 1983 action claiming deprivation of property without due process under the fourteenth amendment and retaliation for the exercise of first amendment rights. The district court, 584 F.Supp. 1369, granted the defendants summary judgment but denied them fees under § 1988. Linhart appeals from the award of summary judgment and the defendants appeal from the denial of fees.

## I.

On November 17, 1982, Wayne Linhart, then acting chief of police of the Village of Clarendon Hills, was given a written reprimand charging him with disloyalty and accusing him of undermining principles upon which the Village government rested. It also charged him with specific violations of the Village Police Department Rules and Regulations, including insubordination, solicitation of favorable acts and political utilization of his official position. The reprimand was signed by the Village Manager, Edward Glatfelter. The events leading up to the letter make up a tale of minor intrigue.

Linhart apparently had aspirations of becoming permanent police chief, and had interviewed with the Police Safety Committee for the job. The Committee, however, nominated Arthur Blackwell to the Village President and Board of Trustees for the position. But while the Safety Committee was interviewing candidates, the Village President, William Muller, had gotten together his own advisory group of village residents for the purpose of finding a suitable candidate. Muller had spoken to plaintiff Linhart about the position before the search began, and in September of 1982 Muller and his group again interviewed Linhart. On October 18, 1982 the Village Board, apparently in the dark about Muller's negotiations with Linhart, unanimously recommended Arthur Blackwell for the position to President Muller.

On Saturday, October 30, Linhart—at the instigation of a friend active in local politics—called Blackwell and asked him to meet him at the police station. When Blackwell arrived the two went into the police chief's office, and Linhart asked Blackwell whether he could handle the job of village manager. Blackwell apparently replied that he could handle any job that he applied for, but that he had not applied for that position. After some talk about inconsequential matters, Blackwell left.

It is not necessary to speculate about the point of that meeting, and about whether Linhart, with the blessing of Muller's group, intended to try to draw Blackwell out of the competition for acting chief of police.[1] For events took an unexpected turn, and it is that turn of events that gives rise to the present litigation. Glatfelter, the Village Manager, learned from Blackwell of the various efforts to interest him in Glatfelter's job, and in particular of the interview in the police chief's office. When confronted with the story, Linhart confirmed its accuracy but refused to tell who had instigated the interview.

On November 17, Glatfelter issued the letter of reprimand. He had met with the Village Board in executive session to discuss the matter, and the Trustees had, without going into specifics, authorized him to reprimand Linhart. The letter that Glatfelter drew up is set out in full in the lower

---

**1.** Village President Muller subsequently invited Blackwell to his home to explain that he was going to propose hiring Linhart as police chief, and to ask Blackwell to consider the job of village manager—a job, as Blackwell replied, that was not open. Muller did propose Linhart to the Board that very evening; the nomination was defeated by a majority.

margin.[2] It described the objectionable conduct, and listed five rules that the conduct violated. A subsequent letter modified the reprimand by deleting reference to one of the rules; this was done after discussion of the alleged violations with Linhart.

## II.

The Village Board soon got a letter from Linhart's lawyer. Unless the reprimand was removed from Linhart's file, and a formal apology filed, the letter said, Linhart was prepared to file suit under 42 U.S.C. § 1983. The letter contained the following sentence:

> As I am sure you are aware, pursuant to Section 1983, if the plaintiff prevails on any count he is entitled to the recovery of all attorney's fees and costs from the defendant irrespective of the damage award.

The Board made two offers in response. It offered first to remove the reprimand letter from Linhart's personnel file upon the naming of a permanent police chief. When Linhart refused that offer, the Board offered to revise the reprimand, deleting all references to specific rules and regulations

---

2. November 17, 1982

Acting Chief Wayne Linhart
211 Burlington Avenue
Clarendon Hills, Illinois 60514
Dear Wayne:

It is unfortunate that this letter, an official written reprimand of you in your capacity as Acting Chief of Police, must be written. It is due to actions you took on October 30, 1982, related as follows.

On Saturday, October 30th, you contacted Arthur Blackwell, a recommended candidate for the position of Chief of Police, and asked him to meet you at your office in the Police Station. Mr. Blackwell did meet with you that evening in your office at which time you asked him if he felt he could perform the job of Village Manager. Someone who you have refused to identify had requested you to make such an inquiry. Mr. Blackwell responded by indicating that he could perform any job for which he applies, but that he had not applied for such a job. Subsequent to this meeting, Village President Muller met with Art Blackwell, at President Muller's request, on Monday, November 1, 1982. In that meeting, President Muller reviewed his decision not to appoint Art Blackwell to the position of Chief of Police. However, he also asked Mr. Blackwell if he would be interested in becoming the Village Manager. Little is left for the imagination in wondering at whose direction you were acting on the evening of October 30th.

In a meeting of November 8th, you confirmed to me your involvement as stated above, but would not indicate at whose request your action was taken.

I find your conduct most unacceptable for a variety of reasons. I still retain my office with the support of a majority of the Board and have knowledge that no action has been taken nor contemplated by the Corporate Authority to seek a replacement. The appointment of any other Manager must be consented to by a majority of that same Board.

As Acting Chief you are one of the principal appointive officers who are answerable to and under the supervision of the Village Manager (Police Department Rules and Regulations, Section 4.02, Village Code Section 4.07(e)(4) and (5) and Section 6.02(b)). Being in such an answerable position, I find it unconscionable that you would play a role in any action to seek a replacement candidate for your supervisor's position that was not sanctioned by a majority of the Corporate Authority. Initiating of any such search is a matter left solely to the Corporate Authority with any role on your part restricted to background checks authorized by the Corporate Authority.

In addition to being disloyal and undermining the general principles on which the Village's form of government is based, I also charge you with violating Section 13.00, Subparagraph 5, Insubordination; Subparagraph 9, Solicitation of Favorable Acts; Subparagraph 33, Truthfulness/Cooperation; Subparagraph 36, Cooperation with Internal Investigation; and Subparagraph 46, Political Utilization of Official Position, of the Police Department Rules and Regulations.

I am directing you to not engage in any future action, or respond to any requests from any source, that are contrary to established Village Board policy and to inform me if and when any such requests are made.

Your position, of all Village staff positions, must be held above and beyond any question of political interference or obligation. It is one of the most secure positions in terms of individuals being able to take potentially unfavorable actions against you for refusing to respond to improper requests. I trust such actions will not recur.

Very truly yours,
/s/ Ed Glatfelter
Ed Glatfelter
Village Manager

cc:
President and Board
Personnel File

violated, and to allow Linhart to write a reply to the letter which would be placed in the file.[3]

Linhart refused this second offer as well, in a letter which intimated that no settlement would be possible until Linhart received—as a kind of backpay—an amount equal to the difference between the sergeant's pay he had received as acting chief and the pay a permanent police chief would have received for the same period. The difference amounted to just under $4000. The Board denied the pay demand, and Linhart filed suit. While suit was pending a new Village President was elected to replace Muller; soon afterwards Arthur Blackwell was appointed chief of police, and Linhart took up his duties once more as a sergeant.

The district court dismissed all of Linhart's claims except two: the claim that the Village had deprived him of property without due process in violation of the fourteenth amendment, and the claim that the reprimand was issued in retribution for the exercise of his right to speak freely. The district court then, after discovery, granted the defendant summary judgment on those two remaining counts. Although the opinion in which the district court granted summary judgment was a long and stinging rebuke to plaintiff for having brought the suit in the first place, the judge later denied defendant's request for attorneys' fees under 42 U.S.C. § 1988. He admitted that the case for fees was a close one but found that it was not quite as bad as some recent cases in which fees had been granted to the defendant. He concluded:

> Thus, although he lost his case and got no money, Linhart may take what satisfaction he can from the fact that he has succeeded in using the civil rights laws of this country to make the taxpayers he purports to serve lay out the equivalent of almost a full year of his salary in order to reprimand him.

Linhart appeals from summary judgment; defendants appeal from the denial of fees.

### III.

To overturn summary judgment, it is only necessary for plaintiff to show that there is in dispute a genuine issue of material fact. He must, however, allude to specific facts which raise a genuine issue for trial; "a bare contention that an issue of fact exists is insufficient to raise a factual issue." *Posey v. Skyline Corp.*, 702 F.2d 102, 104–05 (7th Cir.1983).

Section 1983 creates a federal action against a state or municipality for deprivation of property or liberty without due process of law. Linhart did not succeed in convincing the district court that he had been deprived of property, or any other significant interest, or that the defendants acted without affording him due process; and we are inclined to agree with the district court that he has not even succeeded in raising an issue of material fact in these respects. Assuming, for the sake of argument, that Linhart was entitled to certain procedures—including a hearing—before being disciplined, that is not enough by itself to support a section 1983 action. The plaintiff must have been deprived of some legally cognizable interest. It is established, beyond question, that had Glatfelter published the reprimand in a local paper, and had the reprimand been false in every detail, there would still not be enough to support a section 1983 action, *unless* by publishing the false letter the Village deprived Linhart of a protected liberty or property interest. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *Bone v. City of Lafayette*, 763 F.2d 295, 297 (1985); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1138 (7th Cir.1984). No such interest can be found in this case.

Linhart's job as a sergeant is a civil service job, and consequently he may have

---

3. This redacted letter was in fact eventually put into Linhart's file, although without a response from him.

a property interest in that job. Moreover, he certainly has a liberty interest in his profession; to exclude him from the practice of it would deprive him of one aspect of his liberty. *Lawson, supra,* 725 F.2d at 1138. But he has not lost his job as a sergeant, and a fortiori he has not been excluded from a profession.

Moreover, he cannot claim a property interest in the job of police chief. As an acting police chief he held his position at the pleasure of Glatfelter and the Board of Trustees, and even if the letter of reprimand kept him from promotion to permanent chief—nothing in the evidence suggests that it did—he has no property interest in that position; the Village did not owe it to Linhart to make him chief of police. It would be inappropriate to speculate about what effect the reprimand might have if Linhart were to seek employment in his field elsewhere, since Linhart has not alleged that he sought and was denied such employment.[4]

If Linhart has not been deprived of property or liberty, it is not necessary to determine whether he was given due process before being reprimanded: even if the reprimand was improper it will not support an action under § 1983. Nevertheless, Linhart fails to indicate any way in which procedure was abridged or violated in this case. He suggests that he was not given a hearing before being reprimanded, but does not cite any authority for the proposition that he is entitled to a hearing. Since Linhart has not brought to our attention any controverted and genuine issue of fact material to the outcome of the due process claim, we affirm summary judgment on that issue.

### IV.

 The extent to which a state or municipality may limit an employee's right to speak is governed by the first and fourteenth amendments to the Constitution. The state or municipality may not punish an employee for speaking out on a matter of public concern, *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), provided that the government's interest in efficient operation does not outweigh the importance of the right to speak in the individual case, *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

In *Yoggerst v. Stewart,* 623 F.2d 35 (7th Cir.1980), a government employee was reprimanded for saying over the telephone, when she learned that the director of the department for which she worked was going to be replaced, "Have you heard the good news?" She brought a section 1983 action alleging that her first amendment rights had been violated; the district court granted summary judgment for defendants. Finding that too much of a factual nature remained unsettled, we reversed. We held that the speech in question was protected, involving as it did a matter of some public importance, and we remanded so that the district court could determine whether the first amendment protection was outweighed by considerations of efficiency, discipline and loyalty. 623 F.2d at 40–41. Following our remand the Supreme Court decided *Connick,* and on the basis of the holding in that case, finding that the speech in question before it did not address a matter of public concern, the district court held that, as a matter of law, the comment was not protected speech and dismissed Yoggerst's complaint. On appeal we affirmed, saying:

> It is clear from the content of Yoggerst's statement that she was speaking in her role as an employee about her personal feelings and not in her role as a citizen on a matter of public concern.

739 F.2d 293, 296 (1984) [*Yoggerst* II]. It did not avail the plaintiff that the matter that elicited her expression of happiness—the termination of the director—was itself a matter of public concern; what mattered

---

**4.** We note that the letter of reprimand remains in Linhart's file to raise the possibility of affecting outside employment only because he re-
fused the Village's offer to remove it when he resumed his civil service position.

was that her question was an expression of personal dislike, and that "publication of the remark would provide no basis for determining his qualification for continuing in public office." 739 F.2d at 296.

The touchstone in *Connick*, on which *Yoggerst* II was based, is the difference between matters of public concern and matters of personal interest: "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, ... a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 103 S.Ct. at 1690. In this case, Linhart asked Blackwell whether he was interested in the Village Manager's job. It is true that there might be public concern about the fact that Linhart is recruiting replacements for the Village Manager, and thus is evidently unhappy with—or is working on behalf of someone who is unhappy with—Glatfelter's tenure in that position; but the *Connick* test does not consist in looking at what might incidentally be conveyed by the fact that the employee spoke in a certain way. The test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest? In *Connick* itself there was no doubt that the issues raised by the employee, issues of morale and discipline, were of public concern; the Court looked beyond that fact to the employee's motive in raising them:

> While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather information for another round of controversy with her superiors.

103 S.Ct. 1691. Similarly, in *Yoggerst*, the question the employee asked expressed dissatisfaction with her superior, and employee dissatisfaction is of some public concern.

But the *point* of asking the question was not to bring the fact of employee dissatisfaction to the attention of the public, but simply to air her own feelings about the director.

 Here there is little doubt that, whatever Linhart meant to accomplish, it was not his intention to speak out on a matter of public concern. Whether he was merely a conduit for the concerns of another, or whether his interest was in securing the job of chief of police, his aim, under the reasoning in *Yoggerst*, was something "only of personal interest," and thus does not amount to protected speech. As the district court noted, most of the evidence on this point is from Linhart's own testimony:

> At his deposition, Linhart candidly admitted that his thoughts regarding Glatfelter's performance were his own "personal opinion and concern," which he had never publicly expressed. (Linhart dep. at 105). This concession that his opinion of Glatfelter's work was entirely personal knocks the props out from under the assertion that Linhart felt his differences with Glatfelter represented a matter of public concern. And if that were not enough, Linhart has gone further and admitted that he cannot even say that he was thinking of his personal assessment of Glatfelter when he talked to Blackwell. When asked if "part of what was in [his] mind" when he met with Blackwell was his opinion that Glatfelter "could put out a better effort on the job," Linhart responded, "I honestly don't know." (*Id.* at 102). Moreover, it is clear that Linhart did not approach Blackwell because he thought Blackwell could do a better job for the public than Glatfelter. Linhart has stated that he did not think Blackwell "had the education or the experience" to do Glatfelter's job. (*Id.* at 82).

The similarities to the relevant facts of *Yoggerst* are striking; an in-office remark concerning a supervisor, motivated by no apparent concern for the public interest, resulting in a reprimand. If *Yoggerst* was

properly decided, therefore, Linhart's behavior is not protected.

Linhart's behavior *would* have been protected had he publicly accused Glatfelter of inefficiency or incompetence, or had he publicly criticized the administration of Glatfelter for its conduct of office. Even then, of course, that would not be the end of the matter. For under *Pickering* the right of the employee to comment on matters of public concern must be weighed against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. And here, even if Linhart's behavior had been protected, its effect was necessarily so disruptive that that alone may well support the grant of summary judgment. Since we have determined that the speech was not protected, however, we see no reason to reach that issue.

## V.

Defendants, having won on all issues, asked for attorneys' fees. The district judge, although sympathetic, decided that the case did not quite reach the level of frivolousness that would support an award of fees to defendants. This matter is largely entrusted to the discretion of the district court, *Badillo v. Central Steel and Wire Co.*, 717 F.2d 1160 (7th Cir.1983), and although we may have found no abuse if the judge had awarded fees, from what we have seen of the case it was also no abuse of discretion not to award fees.

Defendants complain that the judge applied a higher standard because they were defendants, and that such a distinction cannot be found in the law. But such a distinction between plaintiff and defendant is precisely what the law requires in this circuit. *See Badillo, supra*, at 1164 (fees for defendant under § 1988 "limited to situations where plaintiff's conduct was abusive, or merely a disguised effort to harass or embarrass the defendant"). The district court found enough merit—though barely—to defeat the motion for fees, and we see no reason to disturb that judgment.

The judgment of the lower court is affirmed in all respects.